David N. Lake, State Bar No. 180775
**LAW OFFICES OF DAVID N. LAKE,**
**A Professional Corporation**
16130 Ventura Boulevard, Suite 650
Encino, California 91436
Telephone: (818) 788-5100
Facsimile: (818) 788-5199

Attorneys for Plaintiffs Mark Palmer
and WOW Designs, Inc.



FILED
CLERK, U.S. DISTRICT COURT

NOV 21 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

MARK PALMER, an individual, WOW DESIGNS, INC, a California corporation,

Plaintiff,

v.

MARK HUNTER, an individual; FLIPSCRIPT, INC., a Delaware corporation; and DOES 1 through 25, inclusive,

Defendants.

And

GLYPHUSION, INC., a Delaware corporation,

As a Nominal Defendant in Derivative Claims.

Case No. CV 11-7512 JAK (AGRx)

**SECOND AMENDED COMPLAINT FOR:**

1) **CONSTRUCTIVE FRAUD;**
2) **BREACH OF FIDUCIARY DUTY;**
3) **BREACH OF CONTRACT;**
4) **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING;**
5) **UNFAIR COMPETITION;**
6) **INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONSHIP; and**
7) **MISAPPROPRIATION OF TRADE SECRETS**

ORIGINAL

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

Plaintiffs Mark Palmer and WOW Designs, Inc. allege as follows:

## GENERAL ALLEGATIONS

## THE PARTIES

1.      Plaintiff Mark Palmer ("Palmer" or "Plaintiff"), is and at all relevant times was an individual residing in the State of California, County of Los Angeles. Plaintiff Wow Designs, Inc. ("WOW") is, and at all relevant times was a corporation duly organized and existing under the laws of the State of California with its principal place of business in Los Angeles County.  Together, Palmer and WOW shall be referred to herein as "Plaintiffs."

2.      Plaintiffs are informed and believe, and based thereon allege, that Defendant Mark Hunter ("Defendant" or "Hunter") is and at all relevant times was an individual residing in the State of New Jersey.

3.      Plaintiffs are informed and believe, and based thereon allege, that Defendant FlipScript, Inc. ("FlipScript"), is a Delaware corporation with its principal place of business in New Jersey, and is owned in whole or part by Defendant Hunter.

4.      Glyphusion, Inc. ("Glyphusion") is a Delaware corporation and is named herein as a nominal defendant.  Hunter owns eighty percent (80%) of Glyphusion's shares and Palmer owns the remaining twenty percent (20%).

5.      Plaintiff presently is unaware of the true names and capacities of defendants sued herein as Does 1 through 25 inclusive, and therefore sues these defendants by such fictitious names.  Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.  Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named defendants is responsible in some manner for the occurrences alleged in this Complaint, and Plaintiff's damages as alleged herein were proximately caused by their conduct.

6.      Plaintiff is informed and believes, and on that basis alleges, that at all times relevant herein, defendants ("Defendants"), and each of them, were the agents,

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

1   employees, parent or otherwise affiliated corporations or business of the remaining

2   Defendants, and each of them, and in doing things herein alleged, were acting within

3   the course and scope of such agency and employment, and with the permission,

4   consent, and ratification of the remaining Defendants, and each of them.

5        7.     Plaintiff is informed and believes, and on that basis alleges, that each of

6   the Defendants named herein is, and at all times relevant herein was, a party to the

7   unlawful acts and omissions complained of herein, and acted in concert or

8   combination with each of the other Defendants with respect to the actions and

9   matters described in this Complaint or has aided and abetted such other Defendants

10   with respect thereto.

### JURISDICTION AND VENUE

11   

12        8.     Jurisdiction in this matter is based on 28 U.S.C. § 1332 as there is

13   complete diversity between the parties in that Plaintiffs and Defendants are citizens

14   of different states and the amount in controversy exceeds the sum of $75,000.

15        9.     Venue properly lies in the United States District Court for the Central

16   District of California pursuant to 28 U.S.C. § 1391(a)(2) as a substantial part of the

17   events or omissions on which the claims are based occurred in this district.

18   Moreover, Hunter consented to venue in Los Angeles for any suit under or related to

19   the Agreement and Amended Agreement (defined below).

### FACTUAL ALLEGATIONS

20   

21        10.     In or around December 2007, Palmer and Hunter began evaluating and

22   exploring a possible business venture. At the time, Palmer was already the owner of

23   a business known as Wow Tattoos, a tattoo design firm that used Palmer's

24   extremely unique drawings (ambigrams), as part of its business.

25        11.     Eventually, in or around April 2008, those discussions matured into an

26   agreement between them commonly referred to as the "Working Plan" (the

27   "Agreement"). A copy of the Agreement is attached hereto as Exhibit 1 and

28   incorporated herein by reference. The stated purpose of the venture, per the

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

1  Agreement, was to "work together for the purpose of engaging in the creation of
2  computer generated ambigrams and selling such designs." The Agreement further
3  acknowledged that "Although the individual parts may be produced by the Parties
4  individually, the final compilation of the parts and distribution of the ultimate
5  designs shall be done through Glyphusion, Inc."

6       12.    Palmer, the artist, was tasked with the responsibility of producing
7  drawings, also referred to as "Glyphs," which would be provided to Glyphusion in a
8  certain format so that Glyphusion's computer system (referred to as the
9  "Generator") could process the drawings, enabling users of the Generator to input
10 words and have the Generator produce ambigrams which could be purchased. Other
11 artists were allowed to be included in the project as agreed upon by both Palmer and
12 Hunter. to work on or finalize Glyphs. Palmer retained bottom-line responsibility for
13 the creation and delivery of the designs as well as maintaining quality standards.

14      13.    Hunter, the technology specialist, was responsible for developing the
15 software necessary to generate completed ambigram designs. Hunter retained
16 bottom-line responsibility for development of the software system.

17      14.    Both Palmer and Hunter were granted irrevocable, subscription free
18 licenses to use the Generator on a single web site domain. Palmer was permitted
19 this use for the purpose of creating custom tattoo ambigram designs. Hunter was
20 permitted this use for the purpose of creating custom ambigrams expressly not for
21 the custom tattoo market.

22      15.    Originally, Ryan Palmer ("Ryan") was also a party to the Agreement,
23 but his association with Glyphusion was terminated by agreement in or around April
24 2009. At the same time, in light of this change, an "Amended Working Plan" was
25 prepared (the "Amended Agreement"). The Amended Agreement was primarily
26 identical to the original Agreement and, although apparently not executed by both
27 Palmer and Hunter (the only parties to it), Palmer and Hunter had a mutual
28 understanding of the terms and operated from that point forward in accordance with

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

1   the Amended Agreement and conducted themselves as though the Amended

2   Agreement was in place.

3       16.   The most significant change in the Amended Agreement was that

4   Ryan's role of dealing with "Strategic Partnering" was taken over by Hunter.  The

5   responsibilities of Palmer and Hunter remained the same under the Amended

6   Agreement.  The purpose of the enterprise also remained the same as it was in the

7   Agreement.  Moving forward, as Hunter presumably spent his time working on the

8   Generator and improving its capabilities, Palmer drew the Glyphs and sent them to

9   Hunter so they could be input and created by the Generator.

10      17.   In or around September 2009, Hunter told Palmer that he was "in talks

11  with Kay Jewelers (yes, the nation's biggest jeweler)" about getting a "Glyphusion

12  license."  As things progressed with Kay, although Palmer offered to come and meet

13  with the Kay representatives, Hunter declined, kept Palmer out of the meetings and

14  provided Palmer with only certain information as he determined appropriate.  In

15  anticipation of these meetings, at Hunter's request, Palmer drew specific ambigrams

16  (the names of the key Kay players most likely to be at the meetings) so that they

17  could be used as examples and in a different font – one designed to better serve the

18  jewelry marketplace.  In or around January 2010, after receiving these designs,

19  Hunter told Palmer how happy he was with the designs, assured him he would tell

20  Kay no numbers could be discussed at the meeting because he needed "to discuss it

21  with the other shareholder [Palmer]" and that he would "definitely" want Palmer

22  there for the next round of negotiations.  Hunter never mentioned or suggested

23  FlipScript would be involved at all in the Kay deal.

24      18.   In February 2010, Hunter sent a "Kay projection worksheet" to Palmer

25  noting that "no matter how its sliced, this is a pretty big deal and a very big

26  customer."  Later that month, Hunter told Palmer that he had told Kay "we would

27  make sure to get to a 90% success rate if they signed a multi-year contract with us."

28  Palmer wrote to Hunter afterwards asking how many Glyphs Hunter estimated it

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

1  would take to raise the success rate to 90% and about the time frame. Hunter

2  responded stating "I think our best strategy to get there is…do nothing different!"

3  He went on to tell Palmer "So, the strategy pretty much remains as it is. We just

4  need to try to complete as many of the 'high priority' glyphs as possible as those

5  will have the maximum velocity toward getting over that hump." Accordingly,

6  Palmer continued to produce Glyphs and send them to Hunter. Still, Hunter never

7  mentioned or suggested FlipScript would be involved at all in the Kay deal.

8       19.    In or around March 2010, while he continued to produce Glyphs,

9  Palmer asked Hunter about the status of the negotiations with Kay. Hunter

10  responded stating "As far as the Kay Licensing Agreement goes, it was already sent

11  to them earlier this week. However, I have it sitting right here on my desk. Write

12  back with your fax #, and I'll fax it over."

13       20.    In the meantime, as had been the case throughout, Palmer continued to

14  produce Glyphs. On March 7, 2010, Hunter told Palmer "we" continue to wait for

15  word from Kay and said "I'm looking forward to another great batch [of Glyphs]

16  from you, and possibly another full point on the completion percentage! We'll get to

17  90% yet (less than 5% to go…)." Later in March 2010, Hunter told Palmer about

18  another "very big company with about 8000 retail sales points" with whom he was

19  speaking. At this point, Hunter requested Palmer provide closer to 200 Glyphs per

20  month, enticing him saying "I think that for a million+ dollar check every year, you

21  might have an incentive to find the time to put those extra glyphs together. lol."

22  Palmer provided the Glyphs as requested. Again, Hunter never mentioned or

23  suggested FlipScript would be involved at all in the Kay deal.

24       21.    Hunter continued to discuss the parameters of the deal with Kay and

25  would periodically provide certain information regarding same to Palmer. In or

26  around early May 2010, Hunter reported that the agreement with Kay was almost

27  ready to be sent to their legal department for review. At this point, Palmer requested

28  a copy of the agreement, but Hunter did not send it.

22.     In or around June 2010, Palmer again requested a copy of the Sterling agreement. Hunter wrote to Palmer saying he had spoken with "Ted Harper, Glyphusion's attorney for corporate agreements" and that while Palmer could see the agreement, it would "not be acceptable for [Hunter] to actually send out a copy of the document." Although Hunter suggested they could "meet" somewhere or Palmer could "stop by the office" and read it, this was not practically possible given Palmer lived in California and the office and document were in New Jersey. Hunter never provided the agreement to Palmer, but Palmer trusted Hunter telling him in a June 15, 2010 email: "[I] do have to trust that you and Glyphusion's corporate attorney have our collective best interests in mind."

23.     In August 2010, Hunter requested that Palmer "work up" some ambigrams for Mother's Day for a "proof-of-concept for Sterling [Kay]." Hunter subsequently told Palmer that he was heading to Kay's headquarters again, telling Palmer the latest conversations were that Kay was "going to give us a chance. Actually, two chances." Hunter continued:

> They want to discuss doing a trial run for Mother's Day 2011. If that goes well, they'll pull out all the stops for a strong Christmas run, possibly including TV and print ads. If the MD trial goes REALLY well, we may even get the cover of their Christmas catalog! [¶] The pre-made ambigrams you would be creating would be for the marketing of the Mother's Day event, so they are super important.

Every indication from Hunter to Palmer was that Kay was moving forward with Glyphusion, that the work being done by Palmer at Hunter's request was for the benefit of Glyphusion and that Hunter was working solely on behalf of Glyphusion in his dealings with Kay. Palmer sent the ambigrams Hunter requested for the Mother's Day proof-of-concept. Even at this point, Hunter never mentioned or suggested FlipScript would be involved at all in the Kay deal.

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

24.     Throughout the remainder of 2010, Palmer continued to create glyphs and send them to Hunter.  Hunter would comment positively on what he was receiving from Palmer, all the while telling Palmer that Glyphusion was moving closer to the 90% completion rate with each batch sent.

25.     Because there had been no news regarding the Glyphusion deal with Kay, in March 2011, Palmer asked Hunter about the status of the deal and the completion percentage for the Generator.  It was then that Hunter first revealed the truth about what had been going on, but even then only did so impliedly (later to be confirmed overtly).

26.     In a March 3, 2011 email to Palmer, Hunter told Palmer that the completion percentage for the Generator still had not reached 90%.  Hunter then wrote:

> In fact, although we got to the 85% completion point at about the same time you did, we didn't get up to the 90% mark until we had more than 6500 glyphs in the first FlipScript font (if you haven't seen it yet, it's on the website).  So, if that holds true for other styles (and I suspect it would be close), you probably have still another 2500 glyphs to go before you get to 90% in Style L (which is a little over a year from now at the current pace).  [¶] PS – Yes, the Sterling [Kay] deal is still on.

Having read this, Palmer asked Hunter to explain the email in more detail, in particular the cryptic "PS" which simply said the Kay deal was "still on."  In response, Hunter sent another email to Palmer, this one on March 8, 2011.

27.     In his March 8, 2011 email, Hunter attempted to explain his actions and his unilateral decision to have FlipScript and not Glyphusion enter the Kay contract.  As part of this effort, he accused Palmer of being unwilling to do what was necessary to make the Kay deal work with Glyphusion when in fact the opposite was true.  Hunter withheld information from Palmer, never clearly explaining what needed to be done in connection with the Kay deal and, even though he was charged

1  with the responsibility of hiring employees for Glyphusion, Hunter never suggested
2  or discussed with Palmer the possibility of bringing on another artist to aid with the
3  Kay deal.

4      28.    Hunter then confessed that he had shifted the Kay deal away from
5  Glyphusion, apparently long ago, and he had been in "extensive discussions" with
6  Kay which resulted in the deal being done with FlipScript, a company owned by
7  Hunter alone (no ownership interest being held by Palmer), instead of Glyphusion.
8  All of this was done without any notice to, input from or approval by Palmer.

9      29.    Hunter further confessed that, rather than put the time and effort into
10 developing and refining Glyphusion's Generator, he instead did this for FlipScript,
11 thus permitting his separate company to enter the deal with Kay and thereby
12 essentially cutting Palmer out of the deal altogether.

13     30.    Not once did Hunter discuss any of this with Palmer. Rather, Hunter
14 intentionally kept Palmer in the dark, leading him to believe the work he was doing
15 (e.g., preparing the Mother's Day proof-of-concept for Kay) was for the benefit of
16 Glyphusion and that the Glyphusion-Kay deal was still in the works. In reality,
17 Hunter had hi-jacked the corporate opportunity for himself.

18                **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

19     31.    Plaintiff brings the second, sixth, eighth, ninth and tenth causes of
20 action herein derivatively, in the right and for the benefit of Glyphusion, to redress
21 injuries suffered and to be suffered by it as a direct result of the misconduct by
22 Hunter. Glyphusion is named as a nominal defendant solely in a derivative
23 capacity.

24     32.    Plaintiff will adequately and fairly represent the interests of Glyphusion
25 and its shareholders in enforcing and prosecuting its rights.

26     33.    Plaintiff is and has been the owner of shares in Glyphusion during the
27 times relevant to Defendant's wrongful course of conduct alleged herein, and
28 remains an owner of Glyphusion.

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

34.     At the time this Complaint was filed, Plaintiff is informed and believes, and based thereon alleges, that the shareholders of Glyphusion are Hunter and Palmer.  Plaintiff did not make any demand on Glyphusion to institute this action because such a demand would have been a futile, wasteful and useless act, particularly for the following reasons:

A)     Defendant has controlled, to the exclusion of the other shareholders, all operations and activities of Glyphusion since its formation, quite frequently failing to consult with or seek the input or approval of any other shareholder or officer of Glyphusion; and

B)     Plaintiff is informed and believes, and based thereon alleges, Defendant, the subject of the derivative claim, presently holds eighty percent (80%) of the outstanding shares of Glyphusion and has set up and is operating a company, FlipScript, that competes with Glyphusion and is another defendant in this action.

35.     In sum, the owners of Glyphusion cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against the person who historically has dominated Glyphusion to promote his own personal agenda.

## FIRST CLAIM FOR RELIEF

(Constructive Fraud)

(Against Hunter and certain Doe defendants)

36.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 30, inclusive, and incorporates them as though fully set forth herein.

37.     As a majority shareholder in Glyphusion, Hunter owed the highest fiduciary duties to Plaintiff, a minority shareholder.  From in or about January 2008 until the date of filing of this Complaint, a confidential relationship existed between Palmer and Hunter.  Upon information and belief, it appears that Hunter used his

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

1  position within Glyphusion as a majority shareholder, officer and director not for

2  Glyphusion's benefit, but rather for his own benefit by operating FlipScript, a

3  business that competes directly with Glyphusion.

4      38.    After making contact with Kay, Hunter led Palmer to believe that his

5  efforts in that regard were on behalf of Glyphusion and in their mutual best interests.

6  Throughout the time Hunter was dealing with Kay, he provided Palmer with

7  information which led him to believe the business deal between Glyphusion and

8  Kay was proceeding normally and that it would produce a great deal of income for

9  both Palmer and Hunter as the shareholders of Glyphusion.

10      39.    Hunter discouraged Palmer from attending meetings with Kay and all

11  the while led Palmer to believe the ambigrams he was preparing were being used by

12  Hunter solely on behalf of Glyphusion to secure a contract with Kay.  Hunter

13  requested Palmer to produce Mother's Day ambigrams for a "proof-of-concept for

14  Sterling [Kay]" telling Palmer that Kay was "going to give us a chance. Actually,

15  two chances." Hunter described the Mother's Day ambigrams to Palmer as being

16  part of Kay's "trial run" for Glyphusion and stressing to Palmer the importance of

17  the ambigrams he was creating for this purpose.

18      40.    At the time the foregoing representations were made, Hunter had no

19  intention of securing the Kay contract for Glyphusion and in fact, on information

20  and belief, had already begun negotiating with Kay for a deal with his other

21  company, FlipScript. None of this was revealed to Palmer. In fact, Hunter did just

22  the opposite, leading Palmer to believe the ambigrams were for the purpose of

23  securing Glyphusion's deal with Kay and that Hunter's efforts were on behalf of

24  Glyphusion. Hunter used these misrepresentations to induce Palmer to continue

25  creating Glyphs and ambigrams, to provide those to Hunter so he could use them for

26  his secret purpose and exclusive benefit.

27      41.    Palmer is informed and believes, and based thereon alleges, that Hunter

28  knew at the time he made the representations that he would get what he wanted from

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

1  Palmer and use it secretly for his personal benefit to secure a contract with Kay

2  before Palmer was any the wiser.

3      42.    Hunter made the foregoing representations to Palmer with the intent to

4  deceive him and to induce him to create Glyphs and ambigrams, to provide those to

5  Hunter so he could use them for his secret purpose and exclusive benefit, all the

6  while leading Palmer to believe his efforts were solely on behalf of Glyphusion and

7  for their mutual benefit.

8      43.    Had Palmer known the true facts, he would never have done these

9  things.  Palmer reasonably relied on the foregoing representations and did so to his

10  detriment.

11      44.    As a direct and proximate result of the foregoing misrepresentations,

12  Plaintiff has suffered damages in an amount to be proven at trial, but in excess of the

13  jurisdictional minimum of this Court.

14      45.    By reason of the foregoing misrepresentations, and their position as

15  Plaintiff's fiduciary, Hunter is guilty of oppression, fraud, and malice.  Hunter

16  knowingly misled Plaintiff with the intent of leading him to believe he was working

17  towards securing a contract with Kay for Glyphusion when, in fact, he knew he was

18  using the misrepresentations so he could acquire what he needed to secretly

19  negotiate a deal with Kay not for Glyphusion, but with FlipScript.  By committing

20  these acts, Hunter consciously disregarded Plaintiff's rights.  Hunter's conduct is

21  despicable and was carried out with full advance knowledge of his promises to

22  Plaintiff.  Therefore, in addition to actual compensatory damages, Palmer is entitled

23  to recover exemplary and punitive damages from Hunter in such amounts as proof at

24  trial may indicate is appropriate.

25  ///

26  ///

27

28

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

## SECOND CLAIM FOR RELIEF

(Breach of Fiduciary Duty – Derivative Claim)

(Against Hunter and certain Doe cross defendants)

46. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 30, 31 through 35 and 37 through 41, inclusive, and incorporates them as though fully set forth herein.

47. As a majority shareholder, officer and director of Glyphusion, Hunter owed the highest fiduciary duties to Glyphusion, including those of loyalty and competence.

48. Plaintiff is informed and believes, and based thereon alleges, that Hunter breached his fiduciary duties by failing in his responsibility to maintain adequate controls, practices and procedures at Glyphusion and, by among other things, placing his personal interests ahead of those of Glyphusion and its owners by usurping Glyphusion's corporate opportunities.

49. As a direct and proximate result of Hunter's breaches of duty alleged herein, Glyphusion has sustained significant damages.

50. As a result of the misconduct alleged herein, Hunter is liable to Glyphusion in an amount to be determined at trial, but in excess of the jurisdictional limit of this Court.

51. By doing the acts alleged above, and more specifically in intentionally misappropriating and usurping Glyphusion's corporate opportunity for his separately owned company, FlipScript, and his own benefit, Hunter is guilty of oppression, fraud and malice, and has acted in conscious disregard of Glyphusion's rights, entitling Plaintiff to an award of punitive damages.

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

## THIRD CLAIM FOR RELIEF

(Breach of Fiduciary Duty)

(Against Hunter and certain Doe defendants)

52.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 30 and 37 through 41, inclusive, and incorporates them as though fully set forth herein.

53.     As a majority shareholder, officer and director of Glyphusion, Hunter owed the highest fiduciary duties to Palmer, including those of loyalty and competence.

54.     Plaintiff is informed and believes, and based thereon alleges, that Hunter breached his fiduciary duties to Palmer by failing in his responsibility to maintain adequate controls, practices and procedures at Glyphusion and, by among other things, placing his personal interests ahead of those of Glyphusion and its owners by usurping Glyphusion's corporate opportunities.

55.     As a direct and proximate result of Hunter's breaches of duty alleged herein, Palmer has sustained significant damages in that the value of his personal interest in Glyphusion has been diminished.

56.     As a result of the misconduct alleged herein, Hunter is liable to Palmer in an amount to be determined at trial, but in excess of the jurisdictional limit of this Court.

57.     By doing the acts alleged above, and more specifically in intentionally misappropriating and usurping Glyphusion's corporate opportunity for his separately owned company, FlipScript, and his own benefit, Hunter is guilty of oppression, fraud and malice, and has acted in conscious disregard of Glyphusion's rights, entitling Plaintiff to an award of punitive damages.

///

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

## FOURTH CLAIM FOR RELIEF

(Breach of Contract)

(Against Hunter and certain Doe defendants)

58.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 30, inclusive, and incorporates them as though fully set forth herein.

59.     Plaintiff has performed all conditions, covenants, and promises required on his part to be performed, in accordance with the terms and conditions of the Agreement and Amended Agreement, except those which have been waived, excused or made impossible to be performed by Defendant.

60.     Notwithstanding, Defendant has breached the Agreement and Amended Agreement by, among other things, failing to develop or maintain the Generator to allow it to perform the functions necessary for Glyphusion to enter into agreements with customers and to ensure the system's full functionality.  Hunter has further breached the Agreement and Amended Agreement by failing to use his best efforts towards the successful operation of Glyphusion and by failing to conduct himself in a fair and proper manner in transactions affecting Glyphusion or Palmer.  Hunter, through FlipScript, is also offering custom ambigram tattoo designs in contravention of the Agreement and Amended Agreement and in direct competition with Glyphusion and Palmer's company, Wow Tattoos.  Hunter was further obligated under the Agreement and Amended Agreement to disclose to Palmer any matter that may prejudice or impact on Glyphusion's business prospects, which he failed to do and, in fact, actively concealed this type of information from Palmer.

61.     The Agreement and Amended Agreement provide that the prevailing party shall recover its reasonable attorneys' fees and expenses incurred.

62.     As a direct result of the above breaches by Hunter, Palmer has suffered the loss of benefits to which he was entitled under the Agreement and Amended Agreement, as well as other financial damage directly attributable to the breaches.

As a direct and proximate result of the breaches of the Agreement and Amended Agreement, Palmer has suffered and will suffer damages in excess of the jurisdictional minimum of this Court. Palmer will pray for leave to amend his complaint when the precise amount of said damages has been ascertained, together with attorneys' fees, costs and interest thereon at the legal rate from the date said damages were suffered.

63.    As the technology specialist and person responsible for developing the software necessary to generate completed ambigram designs and to maintain the Generator so it functions properly, Hunter is in a unique position to control the Generator. In the past, when Hunter was seeking to renegotiate contract terms he threatened to "shut off" the Generator, which would have disastrous results to both the business of Glyphusion and WOW (Palmer's separate company which holds an irrevocable, subscription free license to use the Generator).

64.    Despite Hunter's fiduciary responsibilities, he has threatened to "shut off" the Generator and continues to hold the unilateral power and ability to do so without input from anyone else, including his co-owner Palmer.

65.    Plaintiff is informed and believes, and based thereon alleges, that unless restrained and enjoined, Hunter will misuse his power and authority, as threatened in the past, and will wrongfully "shut off" the Generator or fail to maintain the Generator, the result of which would be great and irreparable injury to Plaintiff in that Plaintiff's business, its good will and business reputation would be seriously compromised.

66.    Plaintiff has no adequate remedy at law for the injury in that it will be impossible for Plaintiff to prove the precise amount of damages that he will suffer if Hunter's conduct is not enjoined thereby precluding Plaintiff from any relief for the wrongful and malicious conduct.

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

67.    To the contrary, if Hunter is enjoined from shutting down the Generator, he will not suffer any irreparable harm as he does not have the right to do so and has an ongoing interest in Glyphusion's use of the Generator.

68.    Plaintiff has demonstrated a likelihood of success on the merits for each cause of action stated against Hunter, and by these allegations has established a balance of hardships in favor of Plaintiff.

69.    Plaintiff therefore seeks a temporary restraining order, preliminary injunction and permanent injunction against Hunter, enjoining him and his agents, employees, affiliates or representatives from shutting down the Generator or failing to maintain the Generator.

## FIFTH CLAIM FOR RELIEF

(Breach of Covenant of Good Faith and Fair Dealing)

(Against Hunter and certain Doe defendants)

70.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 30, inclusive, and incorporates them as though fully set forth herein.

71.    The covenant of good faith and fair dealing imposes a duty on Hunter to do everything the Agreement and Amended Agreement presuppose he will do to accomplish its purpose and to refrain from doing anything which would render performance of the Agreement or Amended Agreement impossible, or that would frustrate Plaintiff's enjoyment of his contract rights.

72.    Hunter has breached the covenant of good faith and fair dealing and frustrated Plaintiff's enjoyment of the Agreement and Amended Agreement by failing to present or discuss with Plaintiff the possibility of having Glyphusion act as a "Value Added Reseller" ("VAR") when at the same time, and unbeknownst to Plaintiff, Hunter was having his separate company, FlipScript, perform these services for customers that could have been and should have been Glyphusion's. Indeed, per the Agreement and Amended Agreement, Hunter was tasked with

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

1  primary responsibility for hiring employees (after discussion with Palmer), but
2  Hunter never did this, and instead used the lack of employees at Glyphusion as an
3  excuse and shuttled VAR customers to FlipScript, which he alone owned and
4  controlled.

5      73.   As a direct result of the above breaches by Hunter, Plaintiff has
6  suffered the loss of benefits to which he was entitled under the Agreement and
7  Amended Agreement, as well as other financial damage directly attributable to the
8  breaches.  As a direct and proximate result of the breaches of the Agreement and
9  Amended Agreement, Plaintiff has suffered and will suffer damages in excess of the
10 jurisdictional minimum of this Court.  Plaintiff will pray for leave to amend this
11 Complaint when the precise amount of said damages has been ascertained, together
12 with interest thereon at the legal rate from the date said damages were suffered.

### SIXTH CLAIM FOR RELIEF

(Unfair Competition – Derivative Claim)

(Against Hunter, FlipScript and certain Doe defendants)

16     74.   Plaintiff repeats and re-alleges each and every allegation contained in
17 paragraphs 1 through 30 and 31 through 35, inclusive, and incorporates them as
18 though fully set forth herein.

19     75.   Plaintiff is informed and believes, and based thereon alleges, that
20 FlipScript is a business owned and operated by Hunter and which provides services
21 that compete directly with Glyphusion's business.

22     76.   Plaintiff is informed and believes, and based thereon alleges, that
23 FlipScript creates computer generated ambigrams and sells them using art,
24 technology and information that properly belongs to or is licensed to Glyphusion.
25 As part of its operations, Glyphusion generates, compiles and maintains data
26 regarding the Glyph combinations, letter combinations and most popular
27 ambigrams.  This data belongs to Glyphusion.

28

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

77.     Rather than fulfill his obligations to develop the technology for Glyphusion, Hunter instead took Glyphusion's data regarding the Glyph combinations, letter combinations and most popular ambigrams and, using this information, developed on behalf of his separate company, FlipScript, a generator based on this data and information which he then used as a basis for entering a lucrative agreement with Kay when the contract was supposed to be solely with and for the benefit of Glyphusion.

78.     Plaintiff is informed and believes, and based thereon alleges, that FlipScript creates computer generated ambigrams, including custom ambigram tattoos, and sells them to customers, including Kay, that could have been serviced by Glyphusion had Hunter fulfilled his obligations to develop technology for Glyphusion. FlipScript is using this technology and information, or a derivative thereof, without consent, to unfairly compete against Glyphusion.

79.     Glyphusion had a reasonable expectation of entering valid business relationships with, among others, Kay, with which Hunter and FlipScript wrongfully interfered and/or prevented.  The direct and proximate result of Hunter's and FlipScript's actions was loss of the relationship with Kay, and others, and harm to Glyphusion.  Hunter's and FlipScript's actions were not legitimate market participation, but rather unfair actions by which they prevented Glyphusion from legitimately earning revenue it had a reasonable expectation of earning.

80.     As a direct and proximate result of FlipScript's wrongful acts, Glyphusion has suffered and will continue to suffer substantial pecuniary losses and irreparable injury to its business reputation and goodwill.  As such, Glyphusion's remedy at law is not adequate to compensate for injuries inflicted by FlipScript. Accordingly, Glyphusion is entitled to temporary, preliminary and permanent injunctive relief.

81.     By reason of such wrongful acts, Glyphusion is and was, and will be in the future, deprived of the profits and benefits of business relationships, agreements,

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

1 and transactions with various existing clients and/or prospective clients, including

2 Kay, and FlipScript has wrongfully obtained such profits and benefits in an amount

3 to conform to proof at trial, but in no event less than the jurisdictional minimum of

4 this Court.

5       82.    By virtue of the above-described violations, Hunter and FlipScript are

6 also liable to Glyphusion for treble damages and attorneys' fees as permitted by law.

7 **SEVENTH CLAIM FOR RELIEF**

8 (Unfair Competition)

9 (Against Hunter, FlipScript and certain Doe defendants)

10       83.    WOW repeats and re-alleges each and every allegation contained in

11 paragraphs 1 through 30, inclusive, and incorporates them as though fully set forth

12 herein.

13       84.    WOW is and has been in the business of creating and selling custom

14 ambigram tattoos for many years. WOW is informed and believes, and based

15 thereon alleges, that FlipScript is a business owned and operated by Hunter that

16 provides, among other services, the ability for customers to create and purchase

17 custom ambigram tattoos.

18       85.    Both the Agreement and the Amended Agreement provide that Hunter

19 is granted a license to use the Glyphusion generator on a single domain for the

20 purpose of creating custom ambigrams expressly ***not*** for the custom tattoo market.

21 Plaintiff is informed and believes, and based thereon alleges, that despite this

22 express prohibition, Hunter and FlipScript create custom ambigram tattoos using

23 confidential and proprietary information belonging to WOW (such as its sales data

24 and its customers' purchasing patterns) and in turn sells its own ambigram tattoos to

25 customers that could have been serviced by WOW. Hunter and FlipScript are using

26 this technology and information, without consent, to compete against WOW.

27       86.    WOW had a reasonable expectation of entering valid business

28 relationships with, among others, the individuals and entities that have purchased

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

1    custom ambigram tattoos from FlipScript.  Hunter and FlipScript have wrongfully

2    interfered with Plaintiff's reasonable expectation and as a direct and proximate

3    result WOW has suffered the loss of the relationships and harm.  Hunter's and

4    FlipScript's actions were not legitimate market participation, but rather unfair

5    actions by which they prevented WOW from legitimately earning revenue it had a

6    reasonable expectation of earning.

7         87.    As a direct and proximate result of Hunter and FlipScript's wrongful

8    acts, WOW has suffered and will continue to suffer substantial pecuniary losses and

9    irreparable injury to its business reputation and goodwill.  As such, WOW's remedy

10   at law is not adequate to compensate for injuries inflicted by Hunter and FlipScript.

11   Accordingly, WOW is entitled to temporary, preliminary and permanent injunctive

12   relief.

13        88.    By reason of such wrongful acts, WOW is and was, and will be in the

14   future, deprived of the profits and benefits of business relationships, agreements,

15   and transactions with various existing clients and/or prospective clients, and Hunter

16   and FlipScript have wrongfully obtained such profits and benefits in an amount to

17   conform to proof at trial, but in no event less than the jurisdictional minimum of this

18   Court.

19        89.    By virtue of the above-described violations, Hunter and FlipScript are

20   also liable to WOW for treble damages and attorneys' fees as permitted by law.

**EIGHTH CLAIM FOR RELIEF**

(Unfair Competition – Derivative Claim)

(Against Hunter, FlipScript and certain Doe defendants)

24        90.    Plaintiff repeats and re-alleges each and every allegation contained in

25   paragraphs 1 through 30 and 31 through 35, inclusive, and incorporates them as

26   though fully set forth herein.

27        91.    On information and belief, FlipScript is using non-public, proprietary

28   information belonging to Glyphusion without consent or permission.  Glyphusion

-21-
Second Amended Complaint

1  generates and maintains data regarding the Glyph combinations, letter combinations

2  and most popular ambigrams. Hunter and FlipScript have taken this confidential and

3  proprietary information and have used it, and continue to use it to create fonts

4  geared towards achieving these same Glyph combinations, letter combinations and

5  most popular ambigrams, but in the FlipScript generator, thereby gaining an unfair

6  advantage. Hunter and FlipScript are using this data, without consent, to compete

7  against Glyphusion.

8      92.   Plaintiff had a reasonable expectation of entering valid business

9  relationships with, among others, Kay, with which Hunter and FlipScript wrongfully

10  interfered, the direct and proximate result of which was loss of the relationship and

11  harm to Plaintiff. Hunter's and FlipScript's actions were not legitimate market

12  participation, but rather unfair actions by which they prevented Plaintiff from

13  legitimately earning revenue.

14      93.   As a direct and proximate result of Hunter and FlipScript's wrongful

15  acts, Glyphusion has suffered and will continue to suffer substantial pecuniary

16  losses and irreparable injury to its business reputation and goodwill. As such,

17  Glyphusion's remedy at law is not adequate to compensate for injuries inflicted by

18  Hunter and FlipScript. Accordingly, Glyphusion is entitled to temporary,

19  preliminary and permanent injunctive relief.

20      94.   By reason of such wrongful acts, Glyphusion is and was, and will be in

21  the future, deprived of the profits and benefits of business relationships, agreements,

22  and transactions with various existing clients and/or prospective clients, and Hunter

23  and FlipScript have wrongfully obtained such profits and benefits in an amount to

24  conform to proof at trial, but in no event less than the jurisdictional minimum of this

25  Court.

26      95.   By virtue of the above-described violations, Hunter and FlipScript are

27  also liable to Glyphusion for treble damages and attorneys' fees as permitted by law.

28  ///

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

# NINTH CLAIM FOR RELIEF

(Interference with Prospective Contractual Relationship – Derivative Claim)

(Against Hunter, FlipScript and certain Doe defendants)

96.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 30 and 31 through 35, inclusive, and incorporates them as though fully set forth herein.

97.     A business relationship or reasonable expectancy of one existed between Plaintiff and, among others, Kay.  The existence of this relationship or expectancy was known to Hunter and FlipScript.  Plaintiff is informed and believes, and based thereon alleges, that FlipScript is a business owned and operated by Hunter and which provides services that compete directly with Glyphusion's business.

98.     Plaintiff is informed and believes, and based thereon alleges, that FlipScript creates computer generated ambigrams and sells them using art and technology which properly belongs to Glyphusion and that rather than fulfill his obligations to develop the technology for Glyphusion, Hunter instead did so for the benefit of his separate company, FlipScript, which then entered into a lucrative agreement with Kay when the contract was supposed to be solely with and for the benefit of Glyphusion.

99.     Plaintiff is informed and believes, and based thereon alleges, that FlipScript creates computer generated ambigrams, including custom ambigram tattoos, and sells them to customers, including Kay, that could have been serviced by Glyphusion had Hunter fulfilled his obligations to develop technology for Glyphusion.

100.   The behavior of Hunter and FlipScript was intentional and with full knowledge of the business relationship or expectancy between Plaintiff and, among others, Kay, and was the direct cause of a breach or termination of the relationship

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

1   or expectancy between Plaintiff and, among others, Kay, which has resulted in

2   damages to Plaintiff.

3       101.   As a direct and proximate result of Hunter's and FlipScript's wrongful

4   acts, Glyphusion has suffered and will continue to suffer substantial pecuniary

5   losses and irreparable injury to its business reputation and goodwill. As such,

6   Glyphusion's remedy at law is not adequate to compensate for injuries inflicted by

7   Hunter and FlipScript. Accordingly, Glyphusion is entitled to temporary,

8   preliminary and permanent injunctive relief.

9       102.   By reason of such wrongful acts, Glyphusion is and was, and will be in

10  the future, deprived of the profits and benefits of business relationships, agreements,

11  and transactions with various existing clients and/or prospective clients, including

12  Kay, and Hunter and FlipScript have wrongfully obtained such profits and benefits

13  in an amount to conform to proof at trial, but in no event less than the jurisdictional

14  minimum of this Court.

15      103.   In addition, because the interference by Hunter and FlipScript was

16  willful and malicious, Glyphusion is entitled to an award of exemplary damages as

17  well as an award of reasonable attorneys' fees.

18                          **TENTH CLAIM FOR RELIEF**

19                  (Misappropriation of Trade Secrets – Derivative Claim)

20                  (Against Hunter, FlipScript and certain Doe defendants)

21      104.   Plaintiff repeats and re-alleges each and every allegation contained in

22  paragraphs 1 through 30 and 31 through 35, inclusive, and incorporates them as

23  though fully set forth herein.

24      105.   On information and belief, FlipScript is using non-public, proprietary

25  information belonging to Glyphusion without consent or permission. Glyphusion

26  generates, compiles and maintains data regarding the Glyph combinations, letter

27  combinations and most popular ambigrams with reasonable efforts taken to maintain

28  its secrecy. This data enjoys independent economic value, actual or potential, from

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

1  not being generally known to, and not being readily ascertainable by proper means

2  by, other persons who can obtain economic value from its use.

3     106.   Without right or permission, express or implied, and through improper

4  means, Hunter and FlipScript have misappropriated this confidential and proprietary

5  information and have used it, and continue to use it to create fonts geared towards

6  achieving these same Glyph combinations, letter combinations and most popular

7  ambigrams, but in the FlipScript generator.

8     107.   By reason of such wrongful acts, Glyphusion is and was, and will be in

9  the future, deprived of the profits and benefits of business relationships, agreements,

10  and transactions with various existing clients and/or prospective clients, and Hunter

11  and FlipScript have wrongfully obtained such profits and benefits in an amount to

12  conform to proof at trial, including both the actual loss caused by misappropriation

13  and the unjust enrichment caused by misappropriation.

14     108.   As a direct and proximate result of Hunter and FlipScript's wrongful

15  acts, Glyphusion has suffered and will continue to suffer substantial pecuniary

16  losses and irreparable injury. Accordingly, Glyphusion is entitled to temporary,

17  preliminary and permanent injunctive relief.

18     109.   In addition, because the misappropriation by Hunter and FlipScript was

19  willful and malicious, Glyphusion is entitled to an award of exemplary damages as

20  well as an award of reasonable attorneys' fees.

21                  **ELEVENTH CLAIM FOR RELIEF**

22                     (Breach of Contract - NDA)

23                (Against Hunter and certain Doe defendants)

24     110.   Plaintiff repeats and re-alleges each and every allegation contained in

25  paragraphs 1 through 30, inclusive, and incorporates them as though fully set forth

26  herein.

27     111.   Prior to entering a formal business arrangement between them, Hunter

28  on the one hand and Palmer and WOW on the other hand executed a Non-

-25-

1   Disclosure Agreement ("NDA") which, per its terms, was intended to protect

2   Palmer's and WOW's proprietary and confidential information, concepts, ideas and

3   designs from use by Hunter or his businesses.  A copy of the NDA is attached hereto

4   as Exhibit 2 and incorporated herein by reference.  Palmer had approximately three

5   years experience drawing, creating and assembling uniquely styled ambigrams and

6   solutions to letter combinations which he brought to bear  in connection with the

7   "Ambigram generator project consultation and other proprietary information" (the

8   "Information").  Palmer/WOW (the defined Designer) and Hunter (the defined

9   recipient) agreed Palmer would disclose the Information to Hunter for the sole

10  purpose of Hunter's evaluation thereof to determine interest in the commercial

11  exploitation of the information.

12      112.   Pursuant to the NDA, Hunter expressly agreed not to "manufacture,

13  sell, deal in, or otherwise use or appropriate the disclosed Information in any way

14  whatsoever, including but not limited to adaptation, imitation, redesign, or

15  modification….Nothing contained in this Agreement shall be deemed to give

16  [Hunter] any rights whatsoever in and to the Information."  Hunter acknowledged in

17  the NDA that the unauthorized disclosure of the Information would irreparably

18  damage Palmer.

19      113.   Despite Hunter's assurances set forth in the NDA, he, and his company

20  FlipScript, have used the Information they were provided by Palmer and have done

21  so without Palmer's or WOW's permission.  On information and belief, Hunter and

22  FlipScript have taken the Information covered by the NDA and adapted, imitated,

23  redesigned or modified it and are now using it without the right to do so.  On

24  information and belief, Hunter and FlipScript are using Palmer's and WOW's

25  uniquely styled solutions and letter combinations as the foundation and basis for

26  their competing generator software and have embedded this into the software.

27      114.   Plaintiff is informed and believes, and based thereon alleges, that

28  unless restrained and enjoined, Hunter and FlipScript will continue to violate the

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

1   NDA and use the Information without regard to Plaintiff's rights and interests and

2   will do so for their personal and exclusive benefit and personal gain.

3       115.   Hunter and FlipScript intend to, and unless enjoined by this Court will,

4   continue to wrongfully use Plaintiff's Information without permission and to

5   continue to breach the NDA and misdirect business to themselves as part of their

6   unfair competition.

7       116.   Hunter's and FlipScript's wrongful and malicious conduct, unless or

8   until enjoined and restrained by order of this Court, will cause great and irreparable

9   injury to Plaintiff in that Plaintiff's Information is being misused by Hunter and

10   FlipScript.

11       117.   Plaintiff has no adequate remedy at law for the injury that is currently

12   being suffered by Hunter's and FlipScript's knowing and wrongful use of the

13   Information in that it will be impossible for Plaintiff to prove the precise amount of

14   damages which he will suffer if their conduct is not enjoined thereby precluding

15   Plaintiff from any relief for their continued wrongful and malicious conduct.

16       118.   To the contrary, if Hunter and FlipScript are enjoined from their

17   wrongful conduct, they will not suffer any irreparable harm as they do not have the

18   right to use the Information.

19       119.   Similarly, if Hunter and FlipScript are enjoined from their wrongful

20   conduct, they will not suffer any irreparable harm as they can maintain an action for

21   money damages against Plaintiff should they ultimately prevail at trial.

22       120.   Plaintiff has demonstrated hereinabove a likelihood of success on the

23   merits for each cause of action stated against Hunter and FlipScript, and by these

24   allegations has established a balance of hardships in favor of Plaintiff.

25       121.   Plaintiff therefore seeks a temporary restraining order, preliminary

26   injunction and permanent injunction against Hunter and FlipScript, enjoining them

27   and their agents, employees, affiliates or representatives from using the Information

28   or any adaptation, imitation, redesign or modification of it.

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

**WHEREFORE**, plaintiffs pray for judgment as follows:

1. On all causes of action for compensatory damages;

2. On the first, second, third, ninth and tenth causes of action, for exemplary damages in an amount to be proven at trial;

3. On the sixth, seventh and eighth causes of action, for treble damages as permitted by law;

4. On the fourth, sixth, seventh, eighth, ninth and tenth causes of action for attorneys' fees;

5. By reason of the fraudulent manner in which Hunter acted with respect to this matter, for a constructive trust against Hunter and his company, FlipScript, as involuntary trustees holding the funds and assets obtained through fraud and deception in trust for Glyphusion with the duty to pay Glyphusion;

6. For temporary, preliminary and permanent injunctive relief and for disgorgement of all profits;

7. For an order that defendants hold any funds, profits, income or revenues generated from Glyphusion's assets or the use of Glyphusion's assets, and the proceeds thereof, in trust for plaintiffs;

8. For temporary, preliminary and permanent injunctive relief against Hunter and FlipScript, enjoining them and their agents, employees, affiliates or representatives from using the Information or any adaptation, imitation, redesign or modification of it;

9. For temporary, preliminary and permanent injunctive relief against Hunter, enjoining him and his agents, employees, affiliates or representatives from shutting down the Generator or failing to maintain the Generator;

10. On all causes of action for costs of suit incurred herein; and

-28-
Second Amended Complaint

1    11. On all causes of action for such other and further relief as the Court

2    deems just and proper.

3

4    DATED: November 18. 2011                    LAW OFFICES OF DAVID N. LAKE

5

6                                               By: _____/S/_____

7                                                   DAVID N. LAKE
                                                    Attorneys for Plaintiffs

8

9

10

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **VERIFICATION**

I, Mark Palmer, am the individual plaintiff in the above-entitled action and an officer of Wow Designs, Inc. I have read the foregoing Second Amended Complaint and know the contents thereof.  The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief and, as to those matters, I believe it to be true. I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed on November 18, 2011, at Whittier, California.

_____/s/_____

Mark Palmer

LAW OFFICES OF DAVID N. LAKE
16130 VENTURA BOULEVARD, SUITE 650
ENCINO, CALIFORNIA 91436
(818) 788-5100

GLYPHUSION WORKING PLAN

THIS WORKING PLAN AGREEMENT ("Agreement") is made this 30th day of April , 2008

BETWEEN

**MARK HUNTER, MARK PALMER and RYAN PALMER (individually a "Party" and collectively "Parties") with regard to Glyphusion, Inc. ("Firm") as specified in the sections that follow.**

## 1 Definitions

1.1    In this Agreement except where the context otherwise requires, the following terms shall have the following meanings;

| | |
|---|---|
| **"Confidential Information"** | shall mean details of suppliers and their terms of business, details of customers and their requirements, the prices charged to and terms of business with customers, marketing plans and sales forecasts (save to the extent that these are included in published audited accounts), any proposals relating to the acquisition or disposal of a company or business or any part thereof or to any proposed expansion or contraction of activities, details of employees and officers and of the remuneration and other benefits paid to them, information relating to research activities, inventions, secret processes, designs formulae and product lines, any information which the Party to this Agreements is told is confidential and any information which has been given to the Firm in confidence by customers, suppliers or other persons. |
| **"Employee Agreement(s)"** | refers to a document which may be executed at some point in the future for each Party of this Agreement at such time as the Firm decides.  Generally, this shall mean that the Firm has become profitable and is able to offer full-time salaried positions to each of the Parties and that the Parties are in such position to accept such employment with the Firm. |
| **"Intellectual Property"** | means any patent, registered or unregistered trade mark or service mark, copyright, registered design or unregistered design right, any application for any of the foregoing, any right in respect of technical or commercial information and any other form of protection. |

Exhibit 1 to Second Amended Complaint

**"Profit"**      refers to any monies remaining after the Firm's liabilities have been paid, and "Loss" has a corresponding meaning;

1.2 In this Agreement:-

 1.2.1 any reference to the parties includes a reference to their respective personal representatives, heirs, successors in title and permitted assignees;

 1.2.2 any reference to a person includes any body corporate, unincorporated association, Party to this Agreement or any other legal entity;

 1.2.3 words importing the singular number include the plural and vice versa; and

 1.2.4 words importing any gender include any other gender.

1.3 The headings in this Agreement are for convenience only and shall not affect its interpretation.

## 2 Concept and Name

2.1 The Parties to this Agreement wish to work together for the purpose of engaging in the creation of computer generated ambigrams and selling such designs.

2.2 Although the individual parts may be produced by the Parties individually, the final compilation of the parts and distribution of the ultimate designs shall be done through Glyphusion, Inc. (the "Firm").

## 3 Commencement and Duration

3.1 Development towards the commercialization of this technology began on or around January 1, 2008.

3.2 Subject to the provisions for expulsion and dissolution hereinafter contained, the Firm shall continue during the joint lives of the Parties to this Agreement and the survivors of them.

3.3 If any Party to this Agreement ceases to be a Party to this Agreement by reason of his death or expulsion in accordance with the provisions of this Agreement, the Firm shall continue with the surviving or continuing Parties to this Agreement.

3.4 The Parties to this Agreement may terminate their participation in this Agreement by

Exhibit 1 to Second Amended Complaint

giving to all other Parties to this Agreement not less than 120 days written notice of their intention to do so.

## 4 Place of Business

The business of the Firm shall be carried on in New Jersey and California at locations convenient to the Parties of this Agreement, or at locations that the Parties may from time to time determine.

## 5 Capital

5.1     The initial capital of the Firm shall be $20,000, contributed in the form of a loan according to the Second Schedule. The money shall be deposited in cash or in other fully liquid cash equivalent into an appropriate bank account, to be used exclusively for the purposes of paying on-going expenses associated with the business dealings of the Firm.

5.2     The capital for the Firm shall be repaid as quickly as practical, without negatively affecting early-stage operations of the Firm. The Firm shall not allow its bank account balance fall to a point where its ongoing concerns and obligations can not be met expeditiously.

5.3     In the event of a dissolution of the Firm before the initial capital has been fully repaid, any remaining balance on the loan shall be repaid to the lending Party.

5.4     The funds loaned to the Firm shall be repaid at an interest rate of eight (8) per cent per annum on the loaned amount for the time period that the loan is outstanding. Such interest is to be calculated and credited each year before profits are divided. Company auditors shall determine any matters of doubt in relation thereto.

5.5     Loans made to the Firm shall be repaid to the lending Party before any Firm profits are distributed, but after normal operating expenses for the Firm are paid.

5.6     Expected on-going expenses include, but are not limited to: hardware, software, web hosting, advertising and promotion, travel expenses, domain registration, affiliate payments, vendor payments and the like, but do not include payroll or benefits in the absence of a later-dated Employee Agreement stating to the contrary. Any major purchases for the Firm shall be discussed by the Parties before being made.

## 6 Profits and Losses

6.1     Subject to the following provisions of this clause, the Parties to this Agreement shall share the Profit for the Firm in the proportions specified in the Buy / Sell Agreement. If losses are incurred, the losses shall be taken from the funds loaned, specified in the Second Schedule, until such monies are exhausted. In the event that all funds loaned are exhausted and the Firm is still incurring an on-going loss, the Parties to this Agreement shall determine an effective strategy to continue moving forward, or shall make plans for the Firm's dissolution.

Exhibit 1 to Second Amended Complaint

6.2    In the absence of an Employee Agreement specifying a salary or other alternate compensation, any monies earned in excess of initial funds loaned and monthly operating expenses will be paid to the Parties of this Agreements by the 5th day following the last day of each month in the proportions set out in the Buy / Sell Agreement.

## 7 Roles and Responsibilities

7.1    The Parties to this Agreement have identified three (3) key responsibilities to the commercialization of automated ambigrams creation: Artistic Development, Software Development and Strategic Partnering.  Each of these responsibilities shall be critical to the on-going profitability of the venture.

7.2    **Artistic Development.**  Mark Palmer shall have primary responsibility for all aspects of Artistic Development.  Using tools of his choosing, and relying on new or previous ambigram designs of his own original creation, Mark Palmer shall be responsible for designing, rendering, and delivering "Glyphs" in the format designated in section 7.2.3.

   7.2.1   Development of Artistic Content shall be an on-going responsibility and shall be roughly dictated by the needs of the Firm's customer base in order to allow them to generate designs of their choosing.  The Parties have agreed to focus Artistic Development on Mark Palmer's existing bodies of work known as "Font Style L" and "Font Style D", with other Font Styles to be added as deemed appropriate by the Parties.  Continued Artistic Content development shall be considered to be no less than 200 Glyphs per month.

   7.2.2   To complete the base set of Glyphs for each Font, both single-character and multiple-character inversions shall be developed.  Software Development shall assist, as necessary, in the identification of Glyphs which shall be needed for the formation of the majority of designs that shall be encountered in the field (the "Master Glyph List").

   7.2.3   Each completed Glyph shall be delivered in a specific format in order to be processed by the Glyphusion database engine.  The Glyph shall be rendered in Black, with a Red Line identifying the tops and bottoms of lower-case letters, converted to SVG vector format and named according to a related document entitled "Glyph Submission Format" before being sent for processing by the Glyphusion database engine.  It is preferred, but not required that the vector designs be "hand-pulled" in order to allow the designs to scale to any arbitrary large-format design usage in the future.  However, automated batch vectoring is acceptable in order to meet time constraints.

   7.2.4   Mark Palmer may use either of the other two (2) Parties to this Agreement, or outside parties, as he alone shall deem necessary, work on or to finalize Glyphs that he has designed.  In order to insure quality standards, Mark Palmer shall retain bottom-line responsibility for creation and delivery of all Artistic Designs.  Subject to licenses contemplated by this Agreement, Mark Palmer shall retain all ownership rights in all intellectual property as the author of the Glyphs.

Exhibit 1 to Second Amended Complaint

7.3    **Software Development.**  Mark Hunter shall have responsibility for development of the software necessary to generate completed ambigram designs (the "Generator").  The software shall, at a minimum, perform the following essential tasks:

7.3.1    Parsing, refactoring and normalizing the incoming Glyph designs for standardized inclusion in the RDBMS ('Relational Data Base Management System'), including mathematics for standardizing all vector operations to the eight (8) data points of a Cubic Bezier curve (including the calculation of all missing points), standardization of the sizing and positioning based on 'red line' detection and analysis of the Glyph strokes, as well as straightening lines, fixing curves and closing vector shapes for maintaining internal consistency within the data set.

7.3.2    Design, Architecture and Development of the RDBMS.  This includes architecting all Tables, identification of all Relationships, creation of all Indices, development of all insert/update/delete Triggers and authoring of all Stored Procedures for data update and retrieval at run-time.  Clustering, Hashing, Indices, Caching and other performance tuning 'best practice' optimizations shall be incorporated to the extent practicable and necessary for acceptable performance from the system.

7.3.3    Development and programming of the core of the system, which shall identify the Glyphs necessary for completing a design, scoring and ranking the solutions for presentation, assembling the Glyph strokes for rendering a design, positioning the elements for a pleasing output and rendering the completed ambigrams to an appropriate output device, including but not limited to: monitors, printers, and file systems.

7.3.4    Creation of an HTTP web handler that shall accept requests for ambigrams from our business Partners over the Internet, record the deliverable into the customer's account, and send the design for incorporation into our customer's products.  The profits from these sales shall become the bulk of the revenue in the venture.

7.3.5    Development and maintenance of test and/or demo programs to ensure full functionality of the system.

7.3.6    Mark Hunter shall retain bottom-line responsibility for the development of the software system, with input from the other two (2) Parties to this Agreement as he alone shall deem necessary.  Subject to licenses contemplated by this Agreement, Mark Hunter shall retain all ownership rights in all intellectual property as the author of the Generator.

7.4    **Strategic Partnering.**  Ryan Palmer shall have responsibility for identifying, developing and maintaining Strategic Partnerships for the Firm.  These Strategic Partnerships shall provide on-going revenue for the venture.

7.4.1    A Strategic Partnership shall be an agreement with an organization identified as having a customer demographic that could benefit from having access to items

Exhibit 1 to Second Amended Complaint

personalized with rotational ambigrams.  Examples include, but are not limited to: personalized apparel (EmbroidMe), personalized keepsake items (Things Remembered) and personalized tattoo designs (Bullseye).

7.4.2   As Strategic Partnering is an operational and not developmental aspect of the Firm, compensation shall be commission-based instead of equity-based.  Ryan Palmer shall receive a 20% commission of the gross revenue generated by each Partner that he shall bring into the company for the full year that commences on the date of the contract signing.  To encourage continued relationship management, Ryan Palmer shall continue to receive 10% of the revenue for this customer (off the top - before expenses) into perpetuity for as long as the customer continues to generate revenue for the Firm.

7.4.3   As an example, if Ryan Palmer should initiate contact and eventually sign an agreement with a personalized products company which generates $200,000 a year in gross revenue for the Firm, he shall receive 20% of the revenue for that customer for the first year ($40,000) and 10% of the revenue for that customer for every subsequent year ($20,000).  These commissions shall be paid before any profit is calculated, and taxes shall be the responsibility of the recipient.  If there is no profit after the commissions and expenses have been paid by the Firm, the other Parties to this Agreement (Mark Hunter and Mark Palmer) may not receive a profit distribution.

7.4.4   It is in Ryan Palmer's best interest to negotiate the most profitable agreement possible with each customer, without causing a deal to be lost, as his personal compensation will benefit from this arrangement.  In this way, his personal goals are closely aligned with the goals of the Firm.

7.4.5   A typical Strategic Partnership shall include a monthly subscription component, combined with a per-design charge, typically around $6.  However, each agreement shall be individually negotiated according to the size, type and needs of each customer (for additional details, see Section 8).

7.4.6   Each customer shall either be charged immediately upon delivery of their design, or their purchase shall be registered so they can be billed for accumulated design charges on a monthly basis.

7.4.7   Ryan Palmer shall have bottom-line responsibility for initial contact, follow-up and closing of Strategic Partnerships, with input and assistance from the other two (2) Parties upon his request.  For customers that may require additional software development in order to implement their solution, refer to section 7.3.1.

7.4.8   Customer Leads coming into the Firm, whether through outside sources, or coming from the other two Parties to this Agreement, shall be forwarded to Ryan for follow-up, and he shall have the right of first refusal.  If Ryan chooses to not pursue a customer lead, the other Parties to this Agreement may request to claim ownership of the abandoned customer lead, negotiate a Partnership Agreement on their own, and shall work

Exhibit 1 to Second Amended Complaint

under the same terms, with the same commission benefits specified herein.

**7.5   Notice of Default and Cure**

7.5.1   Any Party to this Agreement who fails to perform any of the obligations set forth in sections 7.2, 7.3 or 7.4 of this Agreement shall be in "Default." In the event of a Default, a non-defaulting Party shall send written notice to the defaulting Party and all other Parties to this Agreement at the addresses provided in section 21 of this Agreement, and in the manner set forth in section 21 of this Agreement (the "Default Notice"). The Default Notice shall specifically identify which provision(s) of this Agreement the defaulting Party has failed to perform, and shall provide the defaulting Party with thirty (30) days to cure the specified default (the "Cure Period"). The Cure Period shall begin upon receipt of the Default Notice by the defaulting Party. If the defaulting Party fails to cure the default within the Cure Period, the Party giving the Default Notice may declare the defaulting Party's interest in and rights under this Agreement terminated (the "Termination Notice"). The Termination Notice shall be in writing and sent to the defaulting Party and all other Parties to this Agreement at the addresses provided in section 21 of this Agreement, and in the manner set forth in section 21 of this Agreement. Upon giving the Termination Notice, and from the date thereof, the Firm shall have the right to continue to use for a period of five (5) years all previously created and integrated intellectual property utilized by the Firm pursuant to the licenses set forth in sections 8 & 9, below. The non-defaulting Parties may continue to operate the Firm for the five (5) year period to the absolute exclusion of the Defaulting Party. The Defaulting Party waives and relinquishes all right, title and interest in the Firm, or conferred under this Agreement, as of the date of the Termination Notice.

**8 Subscriptions, Licenses and Sales**

8.1   The designs generated by the Glyphusion generator shall be sold to a customer on both a monthly subscription and a per-design basis. Individual negotiations may increase, decrease, or eliminate one or both of these sources of revenue, as determined by their agreement.

8.2   A typical embodiment of a Strategic Partnership would contain a subscription component of $20-$80 per month for maintenance of their customer account and access to the system plus a $3-$7 per design fee.

8.3   Whenever possible, the purchase and delivery of digital designs shall be a completely automated process requiring little to no human involvement.

8.4   Exceptions are provided for the Parties own usage of the generator as follows:

8.4.1   WowTattoos (the working name of Ryan and Mark Palmer's Tattoo design marketplace) shall be granted an irrevocable subscription-free license in perpetuity to use the generator on a single web site domain (for example, www.wowtattoos.com) for the sole purpose of creating custom tattoo ambigrams designs. A per-design fee of $5 will

Exhibit 1 to Second Amended Complaint

apply, but the design purchase shall include both a stencil and a filled design, in an output format(s) that they shall determine. These designs may be given away or sold for profit, but WowTattoos shall be charged a $5 fee (or other amount agreed upon by the Parties) for each design created in final, non-encumbered form by the Glyphusion generator. This license may not be rented or sold to any other party without prior written approval of the Parties to this Agreement. No other grant of license is conveyed, directly or indirectly, to Mark or Ryan Palmer.

8.4.2   Mark Hunter will be granted an irrevocable subscription-free license in perpetuity to use the generator on a single domain for the purpose of creating custom ambigrams expressly *not* for the custom tattoo market. The per-design fee of $5 will apply, but no stencil-only designs shall be included in the deliverable, as it is recognized that stencil-only designs are a requirement which is unique for the tattoo design market. These designs may be given away or sold for profit, but there shall be a $5 fee (or other amount agreed upon by the Parties) for each design created in final, non-encumbered form by the Glyphusion generator. The designs will be delivered in an appropriate output format(s), to be specified later. This subscription-free license may not be rented or sold to any other party without prior written approval of the Parties to this Agreement. No other grant of license is conveyed, directly or indirectly, to Mark Hunter.

## 9 Ownership and Copyrights

9.1   All works are Copyrighted and owned by their original author.

9.2   Works created specifically for use in this venture continue to be copyrighted and owned by their original author.

9.3   Works not created specifically for this venture (including, but not limited to: glyph designs, source code, database schemas, stored procedures, triggers, documentation, web pages, database records and any other intellectual property developed for purposes other than automated ambigrams creation) continue to be copyrighted and owned by their original author.

9.4   Subject to the provisions of section 7.5 above, the Firm is hereby granted an indefinite, irrevocable, and non-exclusive right to use the aforementioned copyrighted original works of art (including, but not limited to: glyph designs, source code, database schemas, stored procedures, triggers, documentation, web pages, database records and any other intellectual property used to fulfill its purpose of automated ambigram design) as the Firm's business model necessarily depends upon access to these works.

## 10 Non-Exclusivity

10.1   Per Clause 9.4, the Firm shall have an indefinite, irrevocable, and non-exclusive license to Mark Palmer's designs and Mark Hunter's source code. Practically, this shall mean:

Exhibit 1 to Second Amended Complaint

- In the future, Mark Palmer shall continue to be permitted to sell his designs to customers other than the Firm
- In the future, Mark Hunter shall continue to be permitted to use portions of his source code in projects other than the Firm
- In the future, the Firm shall continue to be permitted to incorporate designs, source code and other intellectual property from sources other than the original Parties to this Agreement, although it shall be the Firm's strong preference to continue to use the original sources for subsequent intellectual property development. Any use of intellectual property from sources other than the original Parties to this Agreement must be approved by all Parties in writing.

## 11 Liquidation Events

11.1   In the event of a liquidation of the Firm due to a successful acquisition or initial public offering (IPO), the Firm shall pay off its debts, pay off its lenders (identified in whole or in part by the Second Schedule) and the remaining proceeds shall be divided according to the percentages identified in the Buy / Sell Agreement. Unanimous written consent for such a liquidation event must be obtained from all Parties specified in the Buy / Sell Agreement.

11.2   In the event of a liquidation of the Firm due to dissolution or other inability to proceed, the Firm shall pay off its debts to the best of its ability, followed by its lenders (identified in whole or in part by the Second Schedule), followed by a division of the remaining balance along the equity percentages identified in the Buy / Sell Agreement.

## 12 Auditors, Accounts and Records

12.1   The Auditors shall be "Memoli and McDermott" of Toms River, NJ (www.memolimcdermott.com/firmprofile.html) or an appropriate replacement as determined by the Parties to this Agreement at a later date.

12.2   Proper books of accounts shall be kept giving a true and fair view of the Firm's business. The books shall be available for inspection by each Party to this Agreement and the Auditors at any time. An accurate record of sales will be available in electronic form upon demand.

## 13 Bank Accounts

13.1   "Bank of America" shall be the banker of the Firm. Initial account funding shall be made according to Section 5 and the Second Schedule.

13.2   All Firm monies not required for current expenses and all cheques shall be paid promptly into the Firm bank account.

13.3   All cheques shall be drawn in the name of the Firm, from the Firm's bank account.

Exhibit 1 to Second Amended Complaint

**14 Work and Deliverable Expectations**

14.1    In the absence of an Employee Agreement stating otherwise, each Party to this Agreement may work at hours that they alone determine to be sufficient to meet their deadlines, goals and objectives.  As with any technology start-up, working nights, weekends and non-standard hours may be necessary to meet such goals.  In the absence of a formal Employee Agreement, Holidays and personal time shall be completely at the discretion of each Party to this Agreement.  It is understood by all Parties that falling behind on deadlines and failing to meet objectives will severely impact the venture and, in a worse case scenario, may fatally compromise the project.

14.2    Each Party to this Agreement is expected to communicate working time (including time off) to the other Parties to this Agreement in order to coordinate production efforts.

**15 Obligations of the Parties**

15.1    The Parties to this Agreement agree as follows;

   15.1.1  to use their best efforts towards the successful operation of the Firm and at all times shall conduct themselves in a fair and proper manner in all transactions of any nature affecting the Firm or the Parties;

   15.1.2  all Parties to this Agreement shall disclose to the other Parties any matter that may prejudice or impact upon the business prospects of the Firm;

   15.1.3  that no Party to this Agreement will disclose Confidential Information to any person, firm or business without the prior written consent of all of the other Parties to this Agreement;

   15.1.4 each Party to this Agreement agrees to keep proper records of all business transacted by or on behalf of the Firm;

   15.1.5  that they will duly and punctually pay and discharge his separate and private debts and liabilities and keep the Firm, its property and the other Parties to this Agreements and their respective estates and effects indemnified against all actions, proceedings, costs, claims, and demands in respect thereof;

   15.1.6  comply with all directions, instructions and rules as to the conduct of the Firm's business generally as made from time to time by the Firm.  Such directions, instructions and rules may be created or implemented only by unanimous written consent of all Parties to this Agreement.

Exhibit 1 to Second Amended Complaint

15.2    Each Party to this Agreement warrants that they shall not without the written consent of the other Parties to this Agreement:

    15.2.1  loan, hypothecate or encumber any assets (including money) or property belonging to the Firm to any other person, firm or business, nor accept any such money or property, whether in the form of a loan or otherwise, on behalf of the Firm from any other person, firm or business;

    15.2.2  offer a guarantee, security or any other promise for the payment of any liabilities incurred by the Firm in the ordinary course of business, nor shall he accept a guarantee, security or promise for such sums as may be owed to the Firm from time to time, nor shall accept any compromise or part-payment of any such sums that may be owed to the Firm from time to time;

    15.2.3  assign, mortgage, or charge his share in the Firm or any part thereof;

    15.2.4  open any bank account or borrow any money in the name of or for the Firm.

**16 Hiring and Firing Decisions**

16.1    Save as may be specifically provided for otherwise in an Employee Agreement, all Firm decisions regarding hiring and firing of employees shall be made by Mark Hunter after discussion with the other Parties to this Agreement.

16.2    The above clause is subject to the following exceptions where the unanimous decision of all equity holders will be required:

    16.2.1  the admission of new equity holders to the Firm;

    16.2.2  the alteration of any equity shares in profits and losses of the Firm;

    16.2.3  any amendment of this Agreement.

16.4    Mark Hunter shall be the acting General Manager primarily responsible for hiring and firing, until such time as a new General Manager shall be appointed. Notwithstanding the foregoing, no person shall be fired or hired without first discussing the matter amongst the Parties to Agreement. The acting General Manager shall not be entitled to any additional remuneration or share of profits by virtue of his being the acting General Manager under this Agreement. The day-to-day business affairs of the General Manager or acting General Manager shall include:

    16.4.1  execution of the Firm's policies;

    16.4.2  subject to the foregoing limitations, the hiring and firing of employees, where practicable;

Exhibit 1 to Second Amended Complaint

16.4.3 direction and control of the training and work of the staff;

16.4.4 supervision and maintenance of the Firm's records;

16.4.5 supervision of Firm expenditures and collections;

16.4.6 arranging meetings of the Firm;

16.4.7 such other duties as the Parties to this Agreements shall delegate him from time to time.

16.5 Meetings of the Parties to this Agreement may be called by any Party but, to the extent possible, will be convened upon written request to and notice by the General Manager or acting General Manager.

16.6 Notice of the meetings of the Firm shall be in writing and given to each Party to this Agreement who is capable of attending a meeting, as far in advance of the meeting as circumstances reasonably permit.

## 17 Goodwill

17.1 The goodwill of the Firm shall be deemed to be of nil value and the share of any voluntarily outgoing Party to this Agreement in the goodwill, if any, of the Firm shall automatically accrue to the continuing Party to this Agreements and no voluntarily outgoing Party to this Agreement or his estate shall have any claim in respect thereof.

## 18 Expenses

18.1 A Party to this Agreement is entitled to be reimbursed for reasonable expenses incurred provided same are vouched to the satisfaction of the other Parties to this Agreement.

## 19 Departure

19.1 Any Party to this Agreement may depart from the Firm by giving the remaining Parties to this Agreement not less then 120 days notice in writing of his intended departure date. Final payment arrangements will be made for the departing Party and equity will be reallocated if necessary.

## 20 Former Parties to this Agreement

20.1 Every Former Party to this Agreement shall be entitled, to the extent that any of the following has not been previously paid to him, and subject to the following provisions to-

20.1.1 repayment of his loans (if any) to the Firm;

Exhibit 1 to Second Amended Complaint

MGH

20.1.2   payment of any amount standing to the credit of his current account on the Cessation Date; and

20.1.3   payment of his share of commission or profit for the part of the year that the Party was with the Firm.

20.2   All Firm records and files shall be deemed firm assets and shall remain with the Firm. The withdrawing Party to this Agreement will be entitled to files and records relating to his personal matters.

20.3   A withdrawing Party to this Agreement, or his authorized representative, shall have the right to examine the books and records of the Firm, for a period of 6 months after the effective date of his withdrawal, or until he shall be paid in full, for the purpose of verifying the amount he is to receive for his interest in the firm under this clause.

20.4   All sums payable by Firm to a deceased Party to this Agreement, and all unpaid payable by the Firm to a withdrawing Party to this Agreement who dies, shall be paid to the widow or widower of such Party to this Agreement. If such widow or widower dies on or before the end of the calendar year in which the Party to this Agreement dies, all remaining sums payable by the Firm after the end of the said calendar year shall be paid in equally divided portions to the natural or adopted children of the said Party to this Agreement surviving at the time of each payment. Any Party to this Agreement may, however, designate any person or trustee to be the successor-in-interest to his interest upon his death by submitting a written designation thereof to the General Manager of the Firm. This designation will be kept with the office copy of this Agreement.

20.5   "Accounts receivable", as used herein, shall include unbilled as well as billed services and outlay as shown by Firm records.

## 21 Notices

21.1   Any notice required to be given under this Agreement shall be given by certified mail, return receipt requested, and shall be deemed to be given as of the date of delivery indicated on the return receipt. Notices shall be provided to the Parties at the following addresses:

If to Mark Hunter: 26 Chiswick Court, Jackson, NJ 08527

If to Mark Palmer: 13636 Philadelphia Street, Whittier, CA 90601

If to Ryan Palmer: 6226 Greenleaf Avenue, Apt. C., Whittier, CA 90601

F

Exhibit 1 to Second Amended Complaint

## 22 Nature of Agreement

22.1    This Agreement contains the entire agreement between the Parties with respect to its subject matter and may not be modified except by an instrument in writing signed by each of the Parties.

22.2    Each Party acknowledges that, in entering into this Agreement, it does not rely on any representation, warranty or other provision except as expressly provided in this Agreement, and all conditions, warranties or other terms implied by statute or common law are excluded to the fullest extent permitted by law.

22.3    No failure or delay by either party in exercising any of its rights under this Agreement shall be deemed to be a waiver of that right, and no waiver by either party of a breach of any provision of this Agreement shall be deemed to be a waiver of any subsequent breach of the same or any other provision.

22.4    If any provision of this Agreement is held by any court or other competent authority to be invalid or unenforceable in whole or in part, this Agreement shall continue to be valid as to its other provisions and the remainder of the affected provision.

## 23 Disputes

23.1    In the event that any action, suit, or other proceeding is instituted by any Party to this Agreement to remedy, prevent, or obtain relief from a breach of this Agreement (or arising out of a breach of this Agreement), the prevailing party shall recover all of such party's reasonable attorneys' fees and costs incurred in each and every such action, suit, or other proceeding, including any and all appeals or petitions therefrom.

Exhibit 1 to Second Amended Complaint

## 24 Applicable Law and Jurisdiction

24.1    Delaware State Laws shall apply to the whole of this Agreement.

24.2    Any action initiated by any Party to this Agreement concerning any matter affecting or
relating to the business of the Firm or any Party's interest in the Firm shall be filed and
prosecuted in the United States District Court for the Central District of California.


**IN WITNESS** whereof the parties hereto have hereunto signed their names the day and year first
herein written.


Signed by:

_____               _____
Mark Palmer                                         Date     4/30/08

_____               _____
Ryan Palmer                                         Date     4/30/08

_____               _____
Mark Hunter                                         Date     5/4/08

Exhibit 1 to Second Amended Complaint

## Second Schedule

| Name | Initial Capital (USD) |
|------|----------------------|
| Mark Hunter | $20,000 (loan) |
| Mark Palmer | $0 |
| Ryan Palmer | $0 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

Exhibit 1 to Second Amended Complaint

APR 01,2008 09:50A   Mar 17 05 09:49a   Mitori, Inc.   5626967383   9191951B8407   page 5
p.1

# Mark Palmer & Wow Designs, Inc.
## Nondisclosure Agreement

This Nondisclosure Agreement (the "Agreement") is entered into on this, the 28th day of December, 2007 by and between Mark Palmer and/or Wow Designs, Inc. with its principal offices in Whittier, CA ("Designer") and Mark Hunter representing himself and/or his business, partners, and investors ("Recipient") for the purpose of preventing the unauthorized disclosure of Confidential Information as defined below. The parties agree to enter into a confidential relationship with respect to the disclosure of certain proprietary and confidential information (hereinafter referred to as the "Information").

WHEREAS, the Designer has developed certain valuable information, concepts, ideas, or designs, which the Designer deems confidential Information; and

WHEREAS, the Recipient is in the business of using such Information for its projects and wishes to review the Information; and

WHEREAS, the Designer wishes to disclose this Information to the Recipient;
and

WHEREAS, the Recipient is willing not to disclose this Information, as provided in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants hereinafter set forth and other valuable considerations, the parties hereto agree as follows:

1. Disclosure

Designer shall disclose to the Recipient the Information, which concerns:

"Ambigram generator project consultation and other proprietary information"

2. Purpose

Recipient agrees that this disclosure is only for the purpose of the Recipient's evaluation to determine its interest in the commercial exploitation of the Information.

3. Limitation on Use      EXCEPT FOR "INFORMATION NOT TRANSFERRED
                          FROM DESIGNER TO RECIPIENT" (SEE
                          EXHIBIT "A")
Recipient agrees not to manufacture, sell, deal in, or otherwise use or appropriate the disclosed Information in any way whatsoever, including but not limited to adaptation, imitation, redesign, or modification. Nothing contained in this Agreement shall be deemed to give Recipient any rights whatsoever in and to the Information. (SEE EXHIBIT "A")

DEC 28, 2007 11:51A                        9191951B8407              page 1

Exhibit 2 to Second Amended Complaint

APR 01,2008 09:50A          5626967383                      page 6
Mar 17 08 09:49a    Milori, Inc.       919195188407         p.2

### 4. Confidentiality

Recipient understands and agrees that the unauthorized disclosure of the Information by the Recipient to others outside of Mark Hunter would irreparably damage the Designer. As consideration and in return for the disclosure of this Information, the Recipient shall keep secret and hold in confidence all such Information by not disclosing it to any person or entity outside of Mark Hunter.

### 5. Good Faith Negotiations

If, on the basis of the evaluation of the Information, Recipient wishes to pursue the exploitation thereof, Recipient agrees to enter into good faith negotiations to arrive at a mutually satisfactory agreement for these purposes. Until and unless such an agreement is entered into, this nondisclosure Agreement shall remain in force.

### 6. Miscellany

This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective legal representatives, successors, and assigns.

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first set forth above.

DESIGNER _____     RECIPIENT _____
                Mark Palmer

                                       BY  MARK G. HUNTER
                                           Authorized Signatory, Title

DEC 28, 2007 11:52A            919195188407                 page 2

Exhibit 2 to Second Amended Complaint



Exhibit A - Information not transferred from Designer to Recipient

While Recipient desires to understand and evaluate the proprietary knowledge of Designer in consideration of future endeavors, a failure of Designer to convey valuable and unique proprietary knowledge in the Subject Matter shall not prevent Recipient from pursuing other sources of such knowledge, including consultants, printed or on-line resources or other human owners of Intellectual Property, including himself.

It is hereby recognized that Recipient already possesses certain knowledge in the Subject Matter, as evidenced from the evolved state of his proprietary software application, physical custom jewelry production pieces and prior time-stamped computer based program designs.

Nothing contained in this Non-Disclosure Agreement shall prevent Recipient from continuing to use Intellectual Property of which he is already in possession, nor shall anything in this Agreement prevent Recipient from pursuing other consultants or knowledge sources if the information received from Designer is insufficient to fully complete the system which Recipient is designing.

Designer (Mark Palmer)                    12/28/2007

Recipient (Mark Hunter)                   12/28/2007

Exhibit 2 to Second Amended Complaint